Alan Law (SBN 268334)
COOPER & SCULLY, P.C.
505 Sansome Street, Suite 1550
San Francisco, CA 94111
Tel: 415-956-9700; Fax: 415-391-0274
Email: alan.law@cooperscully.com

Nathaniel K. Scearcy (*pro hac vice* pending)
POTTS LAW FIRM
1901 W.47th Place, Suite 210
Westwood, Kansas 66205
Tel: 816-931-2230; Fax: 816-931-7030
Email: nscearcy@potts-law.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| DOLORES COMPEAN,<br><br>            Plaintiff,<br><br>    v.<br><br>AMERICAN MEDICAL SYSTEMS, INC., AMERICAN MEDICAL SYSTEMS HOLDINGS, INC., ASTORA WOMEN'S HEALTH, LLC, ENDO PHARMACEUTICALS, INC., ENDO PHARMACEUTICALS HOLDINGS, INC., AND ENDO HEALTH SOLUTIONS, INC.,<br><br>            Defendants. | Case No. 5:21-cv-540<br><br>**COMPLAINT AND JURY DEMAND**<br><br>**1.  NEGLIGENCE**<br><br>**2.  STRICT LIABILITY-DESIGN DEFECT**<br><br>**3.  STRICT LIABILITY-MANUFACTURING DEFECT**<br><br>**4.  STRICT LIABILITY-FAILURE TO WARN**<br><br>**5.  BREACH OF WARRANTIES**<br><br>**6.  GROSS NEGLIGENCE** |

1

## **COMPLAINT AND JURY DEMAND**

Plaintiff Dolores Compean ("Plaintiff"), by and through her attorneys of record, and, for her claims against Defendants, American Medical Systems, Inc, American Medical Systems Holding, Inc., Astora Women's Health, LLC, Endo Pharmaceuticals, Inc., Endo Pharmaceuticals Holdings, Inc., and Endo Health Solutions, Inc., states and alleges as follows:

## **JURISIDICTION AND VENUE**

1.     This Court has diversity subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332: "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between (1) citizens of different states."

2.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claims occurred in this District, the Plaintiff resides in this District, and the Defendant is licensed to do business in this state.

3.     This Court has personal jurisdiction over this action and each of the Plaintiff's claims for relief because Defendants have sufficient contacts with the State of California such that they are subject to personal jurisdiction within California in that they purposefully availed themselves of the privilege of conducting activities in this forum by placing their goods into the stream of commerce in the United States and this state in particular.

## **PARTIES**

4.     Plaintiff is a resident of California and was implanted in Upland, California with one or more defective device(s) designed, manufactured, packaged, labeled, marketed, sold and distributed by the Defendants in California, as more fully set forth below.

5.     Defendant American Medical Systems, Inc., subsequently believed to be known as Astora Women's Health, a wholly owned subsidiary of Defendant American Medical Systems Holding Inc., Astora Women's Health Holdings, Inc., and/or Defendant Endo Pharmaceuticals, Inc., Defendant Endo Pharmaceuticals Holding Inc. and/or Defendant Endo Health Solutions Inc., was a Delaware corporation and may be served pursuant to 10 Del. C. § 3111 by serving its registered agent, Corporation Trust Company, at 1209 N. Orange Street, Wilmington, Delaware

19801.

6.      Defendant American Medical Systems Holdings Inc., subsequently believed to be known as Astora Women's Health Holdings or Astora Women's Health, is a Delaware corporation and may be served pursuant to 10 Del. C. § 3111 by serving its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801. This defendant is or was the parent of wholly-owned subsidiary of American Medical Systems, Inc.

7.      Defendant Astora Women's Health, LLC, survivor of merger with or acquiring corporation of American Medical Systems, Inc. and/or American Medical Systems Holdings, Inc, is a Delaware corporation and may be served pursuant to 10 Del. C. § 3111 by serving its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.

8.      Defendant Endo Pharmaceuticals, Inc., is a Pennsylvania corporation, with its principal place of business at 1400 Atwater Drive, Malvern, Pennsylvania 19355. Endo Pharmaceuticals Inc. may be served through its registered agent, Corporation Trust Company, at 1209 N. Orange Street, Wilmington, Delaware 19801.

9.      Defendant Endo Pharmaceuticals Holdings, Inc. (now known as Endo Health Solutions, Inc.) is a Delaware corporation with its principal place of business at 1400 Atwater Drive, Malvern, Pennsylvania 19355. Endo Pharmaceuticals Holdings, Inc. may be served through its registered agent, Corporation Trust Company, at 1209 N. Orange Street, Wilmington, Delaware 19801. Endo Pharmaceuticals Holdings, Inc. was the parent of wholly owned subsidiary, Endo Pharmaceuticals Inc. On May 23, 2012, Endo Pharmaceuticals Holdings, Inc. changed its name to Endo Health Solutions, Inc.

10.     Defendant Endo Health Solutions, Inc., formerly known as Endo Pharmaceutical Holdings, Inc., is a Delaware corporation with its principal place of business at 1400 Atwater Drive, Malvern, Pennsylvania 19355 and is a parent or survivor of mergers with of American Medical Systems Inc. and American Medical Systems Holdings, Inc. Endo Health Solutions, Inc. may be served through its registered agent, Corporation Trust Company, at 1209 N. Orange Street, Wilmington, Delaware 19801.

COMPLAINT AND JURY DEMAND

11.     All acts and omissions of Defendants, as described herein, were done by its agents, servants, employees, and/or owners acting in the course and scope of their respective agencies, services, employments, and/or ownership.

## FACTUAL BACKGROUND

### A.   History and Relationship of Certain Defendants

12.     American Medical Systems, Inc. ("AMS, Inc."), a corporation formed pursuant to the laws of the State of Delaware, obtained clearance from the FDA and designed, developed, manufactured, marketed, distributed, and sold products to treat pelvic organ prolapsed and/or stress urinary incontinence, including the Pelvic Mesh Product which is the subject of this lawsuit. AMS, Inc. was a wholly owned subsidiary of American Medical Systems Holdings, Inc. ("AMS Holdings, Inc") also a Delaware corporation. These entities are sometimes referred to herein as "AMS." On information and belief, AMS, Inc. changed its name to, merged with, or was otherwise subsumed by Astora Women's Health.

13.     In May 2000, AMS Holdings, Inc. changed its name to Astora Women's Health Holdings, LLC and subsequently merged into Astora Women's Health, LLC, also a Delaware Corporation. Astora Women's Health (formerly AMS' Women's Health Division, ultimately began to design, market, and sell AMS, Inc.'s Pelvic Mesh Products. Astora Women's Health Holdings and Astora Women's Health were and are wholly owned subsidiaries of Endo Pharmaceuticals Holdings, Inc. (now known as Endo Health Solutions, Inc.) and/or Endo Pharmaceuticals, Inc. Endo Pharmaceuticals Holdings, Inc. (now known as Endo Health Solutions, Inc.) is the parent company of Endo Pharmaceuticals, Inc. Both Endo entities are Delaware corporations and wholly owned subsidiaries of Endo International, PLC,[1] a global pharmaceutical company with United

---

[1] In its Form 10-K for the fiscal year ending December 31, 2018, Endo International acknowledges the relationship it has with the other defendants, stating: "Vaginal Mesh. Since 2008, we and certain of our subsidiaries, including American Medical Systems Holdings, Inc. (subsequently converted to Astora Women's Health Holding LLC and merged into Astora Women's Health LLC and referred to herein as AMS) and/or Astora, have been named as defendants in multiple lawsuits in various state and federal courts in the U.S...." (emphasis added).

COMPLAINT AND JURY DEMAND

States Headquarters in Malvern, Pennsylvania. The Endo entities are sometimes collectively referred to herein as "Endo."

14.    On April 11, 2011, Endo issued a press release announcing its agreement to acquire AMS. Therein, Dave Holveck, President and Chief Executive Officer of Endo International, said:

> This acquisition is a great step in achieving Endo's core strategy. We are creating a company uniquely positioned to respond to the changing healthcare environment and the competitive, rapidly consolidating industry landscape. Through the acquisition of AMS, we will gain scale in devices and services, and will be positioned as a leading provider of healthcare solutions in the field of pelvic health, with a full spectrum of product offerings ranging from pharmaceuticals to medical devices.

15.    Under the terms of the merger agreement, which was approved by the Boards of Directors of both companies, Endo acquire 100 percent of the shares of AMS for $30.00 per share or a total cash consideration of $2.9 billion in cash, which includes the assumption and repayment of $312 million of AMS debt.

16.    On June 17, 2011, Endo completed the acquisition of AMS for approximately $2.4 billion in aggregate consideration, including $2.3 billion in cash paid for equity, $71.6 million related to existing AMS stock-based compensation awards and certain other amounts, at which time AMS became a wholly-owned subsidiary of ENDO. AMS's shares were purchased at a price of $30.00 per share. The acquisition has been accounted for as a business combination (in accordance with ASC 805 Business Combinations) and, as such, the AMS assets acquired and liabilities assumed have been recorded at their respective fair values. The determination of fair value for the identifiable tangible and intangible assets acquired and liabilities assumed requires extensive use of accounting estimates and judgments.

17.    In reporting the completion of the acquisition of AMS, ENDO provided an Unaudited Pro Forma Condensed Combined Financial Statement which makes clear that ENDO purchased all of AMS's liabilities including all that may be related to products liability claims. The following representation in pertinent part was made regarding the accounting of ENDO's acquisition of AMS's product liability related liabilities:

> Reflects (1) an adjustment to remove AMS's $4.4 million product liability reserve.

COMPLAINT AND JURY DEMAND

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In accordance with ASC 805, the fair value of the pre-acquisition contingency related to product liability cannot be reasonably estimated or determined.

18.    On June 20, 2011, ENDO issued another press release in which it announced the completion of its acquisition of AMS. Therein, Endo announced that on April 11, 2011, it entered into a definitive agreement to acquire AMS, a leading provider of world-class devices and therapies for male and female pelvic health, for approximately $2.9 billion in cash.

19.    On August 9, 2011, the Associated Press reported that Endo advised that its medical device and service revenue totaled $76.3 million, of which $26.8 million came from American Medical Systems.

20.    On the same day, ENDO issued another press release stating in pertinent part:

Our devices and services sales were $76.3 million for the second quarter and demonstrate our increased diversification. Revenues from our device and services segment include $26.8 million from our recent acquisition of American Medical Systems, (AMS), which furthers Endo's evolution from a product-driven company to a healthcare solutions provider. We believe that AMS strengthens Endo's core urology franchise, diversifies revenue and improves gross margin.

21.    The subject synthetic mesh system as designed, manufactured, marketed, distributed, sold and/or supplied by ENDO's predecessor, AMS and/or Astora Women's Health was defective as marketed due to inadequate warnings, instructions, labeling and/or inadequate testing in the presence of AMS and/or Astora Women's Health's knowledge of lack of pelvic health safety.

22.    In 2016, facing numerous lawsuits arising from its Pelvic Mesh Products, ENDO announced that it was closing its Astora Women's Health unit. Suketu Upadhyay, Executive Vice President of Endo International, said that although the company received bids for Astora, "by shutting down the business as opposed to selling it, we are able to reduce the potential for product liability related to future mesh implants, which would not have been achievable in the event of a sale of the Astora business."

23.    At all times herein mentioned, the parent companies participated in, authorized, ratified, approved, and/or directed the actions of their affiliated entities and/or the officers and/or directors of ENDO and/or ENDO's predecessor, AMS, AMS Holdings, and/or Astora Women's

COMPLAINT AND JURY DEMAND

Health, participated in, authorized and/or directed the production and promotion of the aforementioned products when they knew of the hazards and dangerous propensities of said products, and thereby actively participated in the tortuous conduct that resulted in the injuries suffered by Plaintiff. Additionally, the surviving or acquiring corporations or limited liability companies are liable for the actions of the subsumed entities.

24.    American Medical Systems, Inc, American Medical Systems Holding, Inc., Astora Women's Health, LLC, Endo Pharmaceuticals, Inc., Endo Pharmaceuticals Holdings, Inc., and Endo Health Solutions, Inc., are collectively referred to hereinafter as "Defendants."

B.    Defendants' Pelvic Mesh Products

25.    At all times material to this action, Defendants have designed, patented, manufactured, labeled, marketed, and sold and distributed a line of pelvic mesh products. These products were designed primarily for the purposes of treating stress urinary incontinence and pelvic organ prolapse. These products share common design elements and common defects. Moreover, each of these products was cleared for sale in the U.S. after the Defendants made assertions to the Food and Drug Administration of "Substantial Equivalence" under Section 510(k) of the Food, Drug and Cosmetic Act; this clearance process does not require the applicant to prove safety or efficacy.

26.    The products known as Apogee, Perigee, Mini-Arc Sling, Monarc Subfascial Hammock, Sparc, Bio-Arc, In-Fast Ultra, Influence In-Fast, and Elevate as well as any variations of these products and any unnamed AMS pelvic mesh products designed and sold for similar purposes, inclusive of the instruments and procedures for implantation, are collectively referenced herein as "Defendants' Pelvic Mesh Products" or "the Products".

27.    Defendants' Pelvic Mesh Products contain monofilament polypropylene mesh and/or collagen. Despite claims that polypropylene is inert, the scientific evidence shows that this material as implanted in the Plaintiff is biologically incompatible with human tissue and promotes a negative

7

immune response in a large subset of the population implanted with Defendants' Pelvic Mesh Products. This negative response promotes inflammation of the pelvic tissue and can contribute to the formation of severe adverse reactions to the mesh. Furthermore, Defendants' collagen products cause hyper-inflammatory responses leading to problems including chronic pain and fibrotic reaction. Defendants' collagen products disintegrate after implantation in the female pelvis. The collagen products cause adverse tissue reactions, and are causally related to infection, as the collagen is a foreign material derived from animal tissue. Animal collagen is harsh upon the female pelvic tissue. It hardens in the body. When mesh is inserted in the female body according to the manufacturers' instructions, it creates a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities.

28.    Defendants sought and obtained FDA clearance to market the Products under Section 510(k) of the Medical Device Amendment to the Food, Drug and Cosmetics Act. Section 510(k) provides for marketing of a medical device if the device is deemed "substantially equivalent" to other predicate devices marketed prior to May 28, 1976. No formal review for safety or efficacy is required, and no formal review for safety or efficacy was ever conducted with regard to the Products.

29.    On October 20, 2008, the Food and Drug Administration ("FDA") issued a Public Health Notification that described over 1,000 reports of complications (otherwise known as "adverse events") that had been reported over a three year period relating to pelvic mesh products. Although the FDA notice did not identify the transvaginal mesh manufacturers by name, a review of the FDA's MAUDE database indicates that the Defendants' Products are the subject of the notification. In 2008, the FDA described the complications associated with pelvic mesh products as "rare."

30.    On July 13, 2011, the FDA issued a Safety Communication wherein the FDA stated that "serious complications associated with surgical mesh for transvaginal repair of POP are not rare" (emphasis in the original).

31.    The FDA Safety Communication also stated, *"Mesh contraction* (shrinkage) is a

*previously unidentified risk* of transvaginal POP repair with mesh that has been reported in the published scientific literature and in adverse event reports to the FDA . . . Reports in the literature associate mesh contraction with vaginal shortening, vaginal tightening and vaginal pain." (emphasis in original).

32.    Defendants knew or should have known that the Products unreasonably exposed patients to the risk of serious harm while conferring no benefit over available feasible alternatives that do not involve the same risks.

33.    The scientific evidence shows that the material from which Defendants' Products are made is biologically incompatible with human tissue and promotes a negative immune response in a large subset of the population implanted with the Products.

34.    This negative response promotes inflammation of the pelvic tissue and contributes to the formation of severe adverse reactions to the mesh.

35.    The FDA defines both "degradation" and "fragmentation" as "device problems" to which the FDA assigns a specific "device problem code." "Material fragmentation" is defined as an "[i]ssue associated with small pieces of the device breaking off unexpectedly" and "degraded" as an "[i]ssue associated with a deleterious change in the chemical structure, physical properties, or appearance in the materials that are used in device construction." The Products were unreasonably susceptible to degradation and fragmentation inside the body.

36.    The Products were unreasonably susceptible to shrinkage and contraction inside the body.

37.    The Products were unreasonably susceptible to "creep" or the gradual elongation and deformation when subject to prolonged tension inside the body.

38.    The Products have been marketed to the medical community and to patients as safe, effective, reliable, medical devices, implanted by safe and effective, minimally invasive surgical

COMPLAINT AND JURY DEMAND

techniques, and as safer and more effective as compared to available feasible alternative treatments of pelvic organ prolapse and stress urinary incontinence, and other competing products.

39.    Defendants omitted the risks, dangers, defects, and disadvantages of the Products, and advertised, promoted, marketed, sold and distributed the Products as safe medical devices when Defendants knew or should have known that the Products were not safe for their intended purposes, and that the Products would cause, and did cause, serious medical problems, and in some patients, including the Plaintiff, catastrophic injuries.

40.    Contrary to Defendants' representations and marketing to the medical community and to the patients themselves, the Products have high rates of failure, injury, and complications, fail to perform as intended, require frequent and often debilitating re-operations, and have caused severe and irreversible injuries, conditions, and damage to a significant number of women, including the Plaintiff, making them defective under the law.

41.    The specific nature of the Products' defects includes, but is not limited to, the following:

a.    the use of polypropylene and collagen material in the Products and the immune reactions that result from such material, causing adverse reactions and injuries;the design of the Products to be inserted transvaginally, into and through an area of the body with high levels of bacteria that can adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

b.    biomechanical issues with the design of the Products, including, but not limited to, the propensity of the Products to contract or shrink inside the body, that in turn cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

c.    the use and design of arms and anchors in the Products, which, when placed in the women, are likely to pass through contaminated spaces and that can injure major

10

nerve routes in the pelvic region;

d.      the propensity of the Products for "creep," or to gradually elongate and deform when subject to prolonged tension inside the body;

e.      the inelasticity of the Products, causing them to be improperly mated to the delicate and sensitive areas of the vagina and pelvis where they are implanted, and causing pain upon normal daily activities that involve movement in the pelvic region (e.g., intercourse, defecation, walking); and

f.      the propensity of the Products for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time;

g.      the hyper-inflammatory responses to collagen leading to problems including chronic pain and fibrotic reaction;

h.      the propensity of the collagen products to disintegrate after implantation in the female pelvis, causing pain and other adverse reactions;

i.      the adverse tissue reactions caused by the collagen products, which are causally related to infection, as the collagen is a foreign organic material from animals;

j.      the harshness of animal collagen upon the female pelvic tissue, and the hardening of the product in the body;

k.      the creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanted according to the manufacturers' instructions;

l.      the procedure itself, which is part of Defendants' Pelvic Mesh Products, requires the physician to insert the device "blindly" resulting in nerve damage and damage to other internal organs;

m.      the design of trocars, as devices which as part of Defendants' Pelvic Mesh Products

COMPLAINT AND JURY DEMAND

and which are used to insert the Pelvic Mesh Products into the vagina, are defective because the device requires tissue penetration in nerve rich environments which results frequently in the destruction of nerve endings causing pain and other injuries.

42.     The Products are also defective due to Defendants' failure to adequately warn or instruct the Plaintiff, Dolores Compean, and/or her health care providers of subjects including, but not limited to, the following:

a.   the Products' propensities to contract, retract, and/or shrink inside the body;

b.   the Products' propensities for degradation, fragmentation and/or creep;

c.   the Products' inelasticity preventing proper mating with the pelvic floor and vaginal region;

d.   the rate and manner of mesh erosion or extrusion;

e.   the risk of chronic inflammation resulting from the Products;

f.   the risk of chronic infections resulting from the Products;

g.   the risk of permanent vaginal or pelvic scarring as a result of the Products;

h.   the risk of permanent vaginal shortening resulting from the Products;

i.   the risk of recurrent, intractable pelvic pain and other pain resulting from the Products;

j.   the need for corrective or revision surgery to adjust or remove the Products;

k.   the severity of complications that could arise as a result of implantation of the Products;

l.   the hazards associated with the Products;

m.   the Products' defects described herein;

n.   treatment of pelvic organ prolapse and stress urinary incontinence with the Products is no more effective than feasible available alternatives;

o.   treatment of pelvic organ prolapse and stress urinary incontinence with the Products exposes patients to greater risk than feasible available alternatives;

p.   treatment of pelvic organ prolapse and stress urinary incontinence with the Products

makes future surgical repair more difficult than feasible available alternatives;

q.  use of the Products puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

r.  removal of the Products due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

s.  complete removal of the Products may not be possible and may not result in complete resolution of the complications, including pain.

43.    Defendants have underreported information about the propensity of the Products to fail and cause injury and complications, and have made unfounded representations regarding the efficacy and safety of the Products through various means and media. Defendants have also underreported information about the injuries caused by the use of the implantation kits and surgical technique instructions that accompany their pelvic meshes.

44.    Defendants failed to perform proper and adequate testing and research in order to determine and evaluate the risks and benefits of the Product.

45.    Defendants failed to design and establish a safe, effective procedure for removal of the Products, or to determine if a safe, effective procedure for removal of the Products exists.

46.    Feasible and suitable alternatives to the Products have existed at all times relevant that do not present the same frequency or severity of risks as do the Products.

47.    The Products were at all times utilized and implanted in a manner foreseeable to Defendants, as Defendants generated the instructions for use, created the procedures for implanting the devices, provided the surgical kits for implantation, and provided training for the implanting physician.

48.    Defendants provided incomplete and insufficient training and information to physicians regarding the use of the Products and the aftercare of patients implanted with the

13

Products.

49.     The injuries, conditions, and complications suffered by numerous women around the world who have been implanted with the Products include, but are not limited to, erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia (pain during sexual intercourse), blood loss, neuropathic and other acute and chronic nerve damage and pain, pudendal nerve damage, pelvic floor damage, chronic pelvic pain and other debilitating complications.

50.     In many cases, the women have been forced to undergo extensive medical treatment, including, but not limited to, operations to locate and remove mesh, operations to attempt to repair pelvic organs, tissue, and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and operations to remove portions of the female genitalia.

51.     The medical and scientific literature studying the effects of Defendants' mesh products, like that of the product implanted in the Plaintiff, has examined each of these injuries, conditions, and complications, and has reported that they are causally related to the Products.

52.     Removal of contracted, eroded and/or infected mesh can require multiple surgical interventions for removal of mesh and results in scarring on fragile compromised pelvic tissue and muscles.

53.     At all relevant times herein, Defendants continued to promote the Products as safe and effective even when no clinical trials had been done supporting long- or short-term efficacy.

54.     In doing so, Defendants failed to disclose the known risks and failed to warn of known or scientifically knowable dangers and risks associated with the Products.

55.     At all relevant times herein, Defendants failed to provide sufficient warnings and instructions that would have put the Plaintiff and the general public on notice of the dangers and adverse effects caused by implantation of the Products.

56.    The Products as designed, manufactured, distributed, sold and/or supplied by Defendants were defective as marketed due to inadequate warnings, instructions, labeling and/or inadequate testing in the presence of Defendants' knowledge of lack of safety.

C.  The Plaintiff's Experience with Defendants' Pelvic Mesh Product

57.    On or about October 17, 2005, Plaintiff had a Monarc Subfascial Hammock (hereinafter the "Monarc" or "Defendants' Pelvic Mesh Products" or "Product") implanted as treatment for stress urinary incontinence. The Product was implanted in San Antonio Community Hospital, Upland, California, in compliance with the applicable medical standard of care.

58.    The Product was implanted for its intended uses.

59.    Plaintiff's surgery was performed without intraoperative complications.

60.    On or about March 29, 2019, Plaintiff was diagnosed with a foreign body in her bladder by Dr. Michael Consolo, DO.

61.    On or about April 12, 2019, Dr. Michael Consolo, DO diagnosed Plaintiff with exposed mesh just lateral to the right bladder neck with stone formation upon it.

62.    On or about April 12, 2019, Dr. Michael Consolo, DO utilized a laser to remove calcifications on the exposed mesh.

63.    Plaintiff underwent excision/explant of the exposed Product on or about July 22, 2019 by Dr. Victor Nitti, M.D. at UCLA Health in Los Angeles, California.

64.    As a result of having the Product implanted in her, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, permanent and substantial physical deformity, has undergone and likely will undergo corrective surgery or surgeries, and has suffered financial or economic loss, including, but not limited to obligations for medical services and expenses.

65.    Plaintiff, in the exercise of due diligence, could not reasonably have discovered the cause of her injuries, including, but not limited to, the defective design and/or manufacturing of the Product implanted inside of her, until recently.

**CAUSES OF ACTION**

COMPLAINT AND JURY DEMAND

## COUNT 1: NEGLIGENCE

66.    All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

67.    At all times material hereto, Defendants had a duty to Plaintiff and to other foreseeable users of the Product to exercise reasonable care in the design, manufacture, testing, inspection, processing, advertising, marketing, labeling, assembling, packaging, distribution, detailing, promotion and sale of the Product.

68.    Defendants had a further duty to provide adequate and sufficient instructions concerning the proper use of the Product, as well as warnings of the risks, complications and dangers associated with using the Product, to Plaintiff, her implanting physician and to other foreseeable users of the Product.

69.    Defendants breached their duties to Plaintiff when they failed to exercise reasonable care in the design, manufacture, testing, inspection, processing, advertising, marketing, testing, labeling, assembling, packaging, distribution, detailing, promotion and sale of the Product so as to avoid unreasonable risk of harm to women in whom the Product was implanted, including Plaintiff.

70.    Defendants breached their duty to provide adequate and sufficient instructions concerning the proper use of the Product, as well as warnings of the risks, complications and dangers associated with using the Product, to Plaintiff, her implanting surgeon, and to other foreseeable users of the Product.

71.    Defendants failed to perform or rely on proper and adequate testing and research in order to determine and evaluate the risks and benefits of the pelvic mesh products.

72.    The Product implanted in Plaintiff was unreasonably dangerous and defective for reasons that include, but are not limited to, the following:

   a.    The use of polypropylene material in the Product and the immune reaction that results from such material, causing adverse reactions and injuries;

   b.    The design of the Product to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and

COMPLAINT AND JURY DEMAND

1    subsequent tissue breakdown and adverse reactions and injuries;

2    c.    Biomechanical issues with the design of the Product, including, but not limited to,

3        the propensity of the Product to contract or shrink inside the body, that in turn

4        cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in

5        injury;

6    d.    The use and design of arms and anchors in the Product, which, when placed in the

7        women, are likely to pass through contaminated spaces and injure major nerve

8        routes in the pelvic region;

9    e.    The propensity of the Product for "creep," or to gradually elongate and deform

10        when subject to prolonged tension inside the body;

11    f.    The inelasticity of the Product, causing it to be improperly mated to the delicate

12        and sensitive areas of the pelvis where it is implanted, and causing pain upon

13        normal daily activities that involve movement in the pelvis (e.g., intercourse,

14        defecation);

15    g.    The propensity of the Product for degradation or fragmentation over time, which

16        causes a chronic inflammatory and fibrotic reaction, and results in continuing

17        injury over time;

18    h.    The creation of a non-anatomic condition in the pelvis leading to chronic pain and

19        functional disabilities when the mesh is implanted according to the manufacturers'

20        instructions;

21    i.    The Product degrades over time, cause chronic foreign body reactions, fibrotic

22        bridging, mesh contracture / shrinkage, fraying, deformation, roping, rolling and

23        curling of the mesh;

24    j.    Lacked adequate studies to establish safety and effectiveness for permanent human

25        implantation to treat SUI and POP;

26    k.    Disregarded prior experience with the Protegen device when manufacturing the

27        Product;

28    l.    Directions For Use ("DFU") Defendants provided with all Products do not fully

17

disclose or adequately warn about the Products' known or knowable risks, adverse reactions, and characteristics;

m.    The use of polypropylene material in the Product and the failure to provide adequate DFU and training;

n.    Defendants failed to design and establish a safe, effective procedure for removal of their pelvic mesh products; therefore, in the event of a failure, injury, or complication it is impossible to easily and safely remove; and

o.    The pore size and stiffness of the devices were unsafe and resulted in unnecessary complications to women and created an unacceptable risk of chronic pain and the mesh ripping through vaginal tissue.

73.    Defendants also breached their duty to adequately and sufficiently warn Plaintiff and her healthcare providers and other foreseeable users of the Product of the Product's propensity to erode, the rate and manner of mesh erosion, the risk of chronic infections resulting from implantation of the Product, the risk of vaginal scarring as a result of implantation of the medical devices, the risk of recurrent severe pelvic pain and other pain resulting from the implantation of the Product, the need for corrective or revisionary surgery to adjust or repair the Product, or the overall severity of complications that could arise as a result of implantation of the Product.

74.    Defendants' pelvic mesh products incorporate a monofilament polypropylene mesh intended for the treatment of POP and/or SUI. Despite claims that this material is inert, the emerging scientific evidence suggests that this material is biologically incompatible with human tissue and promotes an immune response in a large subset of the population receiving Defendants' pelvic mesh products containing this material. This immune response promotes degradation of the pelvic tissue and can contribute to the formation of severe adverse reactions to the mesh. Moreover, the mesh migrates within the surrounding tissues causing irreparable damage to the tissue including nerve endings residing within the tissues. Damaged nerve endings do not regenerate and lead to debilitating neuromas suffered by patients.

75.    Defendants made claims and representations in documents it submitted to the FDA, in its reports to the public and to healthcare professionals, and in advertisements that the Product

COMPLAINT AND JURY DEMAND

1    did not present serious health risks.

2        76.    These and other representations made by Defendants were false when made and/or

3    were made with the pretense of actual knowledge, when such knowledge did not actually exist, and

4    were made recklessly and without regard to the true facts.

5        77.    These and other representations made by Defendants were made with the intention

6    of deceiving Plaintiff, Plaintiff's healthcare professionals, and other members of the healthcare

7    community and were made in order to induce Plaintiff and her healthcare professionals to rely on

8    misrepresentations and caused Plaintiff to purchase, rely, use, and request the Product and her

9    healthcare professionals to dispense, recommend, or prescribe the Product.

10        78.    Defendants' pelvic mesh products have been and continue to be marketed to the

11   medical community and to patients as safe, effective, reliable, medical devices implanted by safe

12   and effective minimally invasive surgical techniques for the treatment of medical conditions,

13   primarily POP or SUI, and as safer and more effective as compared to the traditional products and

14   procedures for treatment and other competing pelvic mesh products.

15        79.    The Defendants have marketed and sold its pelvic mesh products to the medical

16   community at large and patients through carefully planned, multifaceted marketing campaigns and

17   strategies. These campaigns and strategies include, but are not limited to, aggressive marketing to

18   health care providers at medical conferences, hospitals, and private offices and include the

19   provision of valuable cash and non-cash benefits to health care providers. Also utilized are

20   documents, brochures, and websites offering exaggerated and misleading expectations as to the

21   safety and utility of the products.

22        80.    Contrary to the Defendant's representations and marketing to the medical

23   community and to the patients themselves, the Defendant's pelvic mesh products have high failure,

24   injury, and complication rates, fail to perform as intended, require frequent and often debilitating

25   re-operations, and have caused severe and irreversible injuries, conditions, and damage to a

26   significant number of women, including Plaintiff, making them defective under the law. The

27   Defendant consistently has underreported and withheld information about the propensity of its

28   pelvic mesh products to fail and cause injury and complications, has misrepresented the efficacy

1  and safety of its products, and, through various means and media, has actively and intentionally

2  been misleading the FDA, the medical community, patients, and the public at large.

3      81.    Defendants knew and had reason to know that the Product could and would cause

4  severe and grievous personal injury to its users and that it was inherently dangerous in a manner

5  that exceeded any purported, inaccurate, or otherwise downplayed warnings.

6      82.    Defendants knew or had reason to know that Plaintiff and her physicians and other

7  healthcare providers had no way to determine the truth behind Defendants' concealment and

8  omissions and that these included material omissions of facts surrounding the use of the Product,

9  as described in detail above.

10     83.    In reliance upon these false representations, Plaintiff was induced to and did use the

11 Product, thereby sustaining severe and permanent personal injuries and damages.

12     84.    Had Plaintiff or her treating physician known of the unreasonably dangerous risks

13 associated with the Product at the time of her implant surgery, such knowledge would have

14 affected the treating physician's use of the devices and Plaintiff would not have consented to the

15 implantation of the devices.

16     85.    As a direct and proximate result of Defendants breaches of duty, as described

17 above, Plaintiff has suffered serious and permanent physical and mental injuries and pain and

18 suffering; has undergone medical treatment and likely will undergo further medical treatment and

19 procedures; and has suffered financial and economic loss, including, but not limited to, medical

20 expenses, lost income, out of pocket expenses, and other damages.

21     86.    As a direct, proximate, and foreseeable result of Defendants negligence, Plaintiff

22 has been damaged in an amount to be determined at trial.

23                    **COUNT II: STRICT LIABILITY – DESIGN DEFECT**

24     87.    All paragraphs of this Complaint are hereby incorporated by reference as if fully set

25 forth herein.

26     88.    The Product implanted in Plaintiff was not merchantable and reasonably safe for its

27 intended uses and was defective as described herein with respect to its design. The Product's

28 design defects include, but are not limited to:

a. The use of polypropylene material in the Product and the immune reaction that results from such material, causing adverse reactions and injuries;

b. The design of the Product to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

c. Biomechanical issues with the design of the Product, including, but not limited to, the propensity of the Product to contract or shrink inside the body, that in turn causes surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

d. The use and design of arms and anchors in the Product, which, when placed in women, are likely to pass through contaminated spaces and injure major nerve routes in the pelvic region;

e. The propensity of the Product to "creep" or to gradually elongate and deform when subject to prolonged tension inside the body;

f. The inelasticity of the Product, causing it to be improperly mated to the delicate and sensitive areas of the pelvis where it is implanted, and causing pain upon normal daily activities that involve movement in the pelvis (e.g., intercourse, defecation);

g. The propensity of the Product for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction and results in continuing injury over time;

h. The creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanted according to the manufacturer's instructions;

i. The use of polypropylene material in the Product and the failure to provide adequate DFU and training; and

j. The pore size and stiffness of the devices were unsafe and resulted in unnecessary complications to women and created an unacceptable risk of chronic pain and the mesh ripping through vaginal tissue.

89.    As a result of the design defects set forth herein, the risk of harm in the Product's

COMPLAINT AND JURY DEMAND

1   design outweighed the utility of their design.

2   90.   Feasible, suitable and safer alternative designs, as well as feasible, suitable and

3   safer alternative procedures and instruments for implantation, have existed at all times relevant as

4   compared to the pelvic mesh products. These feasible, suitable and safer alternative designs and

5   procedures would have prevented or minimized Plaintiff's injuries.

6   91.   The Product implanted into Plaintiff was in the same or substantially similar

7   condition as it was when it left the possession of Defendants and in the condition directed by and

8   expected by the Defendants.

9   92.   Plaintiff and her physicians foreseeably used and implanted the Product and did not

10   misuse or alter the Product in an unforeseeable manner.

11   93.   The medical and scientific literature studying the effects of polypropylene pelvic

12   mesh, like Defendants' pelvic mesh products, have examined injuries, conditions, and

13   complications, such as those suffered by Plaintiff, and determined that they are, in fact, causally

14   related to the mesh itself and do not often implicate errors related to the implantation of the

15   devices.

16   94.   As a direct and proximate result of the Product's aforementioned defects as

17   described herein, Plaintiff has suffered serious and permanent physical and mental injuries and

18   pain and suffering; has undergone medical treatment and likely will undergo further medical

19   treatment and procedures; and has suffered financial and economic loss, including, but not limited

20   to, medical expenses, lost income, out of pocket expenses, and other damages.

21   95.   Defendants are strictly liable to Plaintiff for designing, marketing, labeling,

22   packaging, and selling the defective products.

23   **COUNT III:  STRICT LIABILITY– MANUFACTURING DEFECT**

24   96.   All paragraphs of this Complaint are hereby incorporated by reference as if fully set

25   forth herein.

26   75.   The Product implanted in Plaintiff was defective at the time of manufacture,

27   development, production, testing, inspection, endorsement, prescription, sale and distribution, and

28   at the time it left the possession of the Defendants, in that, and not by way of limitation, the

COMPLAINT AND JURY DEMAND

Product differed from the Defendants' intended result and intended design and specifications, and from other ostensibly identical units of the same product line.

76.     At all relevant times Defendants were the manufacturer of the Product.

97.     Defendant designed, manufactured, prepared, assembled, marketed, labeled, distributed and sold the Product.

98.     The Defendant designed the Product as a permanent implant for long term use within the human body.

99.     However, due to the manufacturing defect of the mesh system, the device was not safe or effective for long term use.

100.    The Defendants' Product is not compatible with human tissue and promotes an immune response in a large subset of the population.

101.    The Defendants' pelvic mesh products have high failure, injury, and complication rates, fail to perform as intended, require frequent and often debilitating re-operations, and have caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Plaintiff, making them defective under the law.

102.    The Product's defects, as described herein, made the Product more dangerous than it would have been had the Product been manufactured properly and as specified.

103.    The Product's defects, as described herein, existed at the time the Product left Defendant's control.

104.    The Product implanted into Plaintiff was in the same or substantially similar condition as it was when it left the possession of Defendants and in the condition directed by and expected by the Defendants.

105.    The Product was at all times utilized and implanted in a manner foreseeable to the Defendants, as Defendants generated the DFUs, created the procedure for implanting the devices, and trained the implanting physicians.

COMPLAINT AND JURY DEMAND

106.    As a direct and proximate result of the Product's aforementioned defects as described herein, Plaintiff has suffered serious and permanent physical and mental injuries and pain and suffering; has undergone medical treatment and likely will undergo further medical treatment and procedures; and has suffered financial and economic loss, including, but not limited to, medical expenses, lost income, out of pocket expenses, and other damages.

107.    Defendants are strictly liable to Plaintiff for manufacturing and selling the defective Products.

## COUNT IV:  STRICT LIABILITY–FAILURE TO WARN

108.    All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

109.    Defendants had a duty to give an adequate warning of known or reasonably foreseeable dangers, risks and complications arising from the use of the Product. Defendants owed this duty to warn to all persons whom Defendants should have reasonably foreseen may use or be affected by the Product, including, but not limited to, Plaintiff, Plaintiff's healthcare providers, and the FDA.

110.    Defendants had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public, Plaintiff, Plaintiff's healthcare providers, and the FDA.

111.    The Product implanted in Plaintiff was not reasonably safe for its intended uses and was defective as described herein as a matter of law due to its lack of adequate, appropriate and necessary warnings. Specifically, Defendants did not provide sufficient or adequate warnings regarding, among other subjects:

a.    The Product's propensities to contract, retract, and/or shrink inside the body;

b.    The Product's propensities for degradation, fragmentation, disintegration and/or creep;

c.    The Product's inelasticity preventing proper mating with the pelvic floor and vaginal region;

d.    The rate and manner of mesh erosion or extrusion;

e.    The risk of chronic inflammation resulting from the Product;

COMPLAINT AND JURY DEMAND

f.   The risk of chronic infections resulting from the Product;

g.   The risk of permanent vaginal or pelvic scarring as a result of the Product;

h.   The risk of recurrent, intractable pelvic pain and other pain resulting from the Product;

i.   The need for corrective or revision surgery to adjust or remove the Product;

j.   The severity of complications that could arise as a result of implantation of the Product;

k.   Treatment of POP and SUI with the Product is no more effective than feasible available alternatives;

l.   Treatment of POP and SUI with the Product exposes patients to greater risk than feasible available alternatives;

m.   Treatment of POP and SUI with the Product makes future surgical repair more difficult than feasible available alternatives;

n.   Use of the Product puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

o.   Removal of the Product due to complications may involve multiple surgeries and may significantly impair the patient's quality of life;

p.   Complete removal of the Product may not be possible and may not result in complete resolution of the complications, including pain;

q.   The nature, magnitude, and frequency of complications that could arise as a result of implantation of the Product; and

r.   The material was never intended to be used in a medical device permanently implanted in the body and the material was non-medical grade.

112.   Defendants acted unreasonably in failing to undertake its duties to properly know the qualities of its products and, in representations to Plaintiff and/or to Plaintiff's healthcare providers, concealed and intentionally omitted the following material information:

a.   That the Product was not as safe as other products and procedures available to treat incontinence and/or prolapse;

b.   That the risk of adverse events with the Product was higher than with other products and

COMPLAINT AND JURY DEMAND

procedures available to treat incontinence and/or prolapse;

c.  That the risk of adverse events with the Product was known by AMS and was not adequately tested;

d.  That the limited clinical testing revealed the Product had a higher risk of adverse effects in addition to and above and beyond those associated with other products and procedures available to treat incontinence and/or prolapse;

e.  That Defendants failed to follow up on the adverse results from clinical studies and buried and/or misrepresented those findings;

f.  That Defendants were aware of dangers in its pelvic mesh products, including the pelvic mesh systems, in addition to and above and beyond those associated with other products and procedures available to treat incontinence and/or prolapse;

g.  That the pelvic mesh systems were dangerous and caused adverse side effects, including, but not limited to, higher incidence of erosion and failure at a much more significant rate than other products and procedures available to treat incontinence and/or prolapse;

h.  That patients frequently would need revisionary surgery due to changes in the structure of the Product that would cause it to be become loose or shift position within the body;

i.  That patients needed to be monitored more regularly than usual while using the Product and, in the event the Product needed to be removed, that the procedure to remove the Product had a very high failure rate and/or needed to be performed repeatedly;

j.  That material Defendants were using carried a specific safety warning to never be used as a permanent implant in the human body;

k.  That Defendants rushed the Product to market against the concerns of consultants and employees;

l.  That Defendants were aware of safety issues with the design of the Product and the pain they caused to patients;

m.  That Defendants were aware the Product was not as safe or efficacious as other alternatives;

26

n.  That Defendants internal risk assessments concluded there was lack of data to support the safety and efficacy of the Product; and

o.  That Defendants received complaints about the design of the Product, including from their own consultants, only to conceal them and not make changes to the design.

113.    Defendants were under a duty to disclose to Plaintiff and her physicians the defective nature of the Product, including, but not limited to, the heightened risks of erosion, failure, and permanent injury.

114.    Defendants misrepresented to the medical and healthcare community, Plaintiff, the FDA, and the public at large that the pelvic mesh products had been tested and were found to be safe and effective for the purposes of treating SUI and POP.

115.    These representations were made by Defendants with the intent of inducing Plaintiff, the medical community, and the public to recommend, prescribe, dispense, and purchase the pelvic mesh products for use as a means of treatment for SUI and/or POP, all of which evinced an indifference to the health, safety, and welfare of Plaintiff.

116.    Defendants had sole access to material facts concerning the defective nature of the Product and its propensity to cause serious and dangerous side effects and, hence, cause dangerous injuries and damage to women who used the Product, including Plaintiff.

117.    At the time these representations were made by Defendants and at the time Plaintiff used the Product, she and her implanting surgeon were unaware of the falsehood of these representations, and reasonably believed them to be true.

118.    Defendants' concealment and omissions of material facts concerning the safety of their pelvic mesh products were made to cause Plaintiff's physicians and healthcare providers to purchase, prescribe, and/or dispense the Product and/or to mislead Plaintiff into reliance and cause Plaintiff to use the Product.

119.    Defendants provided incomplete, insufficient, and misleading training and information to physicians to increase the number of physicians utilizing the pelvic mesh products and, thus, increase the sales of the pelvic mesh products, leading to the dissemination of inadequate and misleading information to patients, including Plaintiff.

COMPLAINT AND JURY DEMAND

120.    Defendants intentionally made material misrepresentations to the medical community and public, including Plaintiff, regarding the safety of the Product, specifically that it did not have dangerous and/or serious adverse health safety concerns and that it was as safe as other means of treating SUI and/or POP.

121.    Defendants intentionally failed to inform the public, including Plaintiff and her implanting surgeon, of the high failure rate, erosion, the difficulty of removing the Product, and the risk of permanent injury.

122.    Instead, Defendants chose to over-promote the safety, efficacy, and benefits of the Product.

123.    Had Plaintiff known the true facts about the dangers and serious health and/or safety risks of the Product, she would not have purchased, used, consented to, or relied on the Product.

124.    As a direct and proximate result of the Product's aforementioned defects as described herein, Plaintiff has suffered serious and permanent physical and mental injuries and pain and suffering; has undergone medical treatment and likely will undergo further medical treatment and procedures; and has suffered financial and economic loss, including, but not limited to, medical expenses, lost income, out of pocket expenses, and other damages.

125.    Defendants are strictly liable to Plaintiff for their failure to provide adequate and sufficient warnings to Plaintiff and to foreseeable users of the defective Product.

**COUNT V:   BREACH OF WARRANTIES**

126.    All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

127.    At all times material hereto, the Product was widely sold, distributed, marketed, promoted, and advertised by Defendants as devices to treat POP and SUI for women, including Plaintiff.

128.    Defendants marketed, promoted, advertised, sold and distributed the Product in the State of California and into the stream of commerce knowing that they would enter the State of California and be used therein.

129.    When Defendants placed the Product into the stream of commerce, they knew of the uses for which the devices were intended (to treat POP and/or SUI) and expressly and impliedly warranted the Product to be of merchantable quality and to be safe and effective and fit for such uses.

130.    Defendants made numerous representations about the quality, safety, and effectiveness of the devices, which formed warranties.

131.    At the time of making the warranties, Defendants knew or should have known that, in fact, said representation and warranties were false, misleading, and untrue in that the Product was not safe and fit for their intended use and, in fact, produces serious injuries to the user, including Plaintiff.

132.    Plaintiff and her implanting surgeon reasonably relied upon the expertise, skill, judgment and knowledge of Defendants and on the express and/or implied warranties that the Product was of merchantable quality and fit for use to treat POP and/or SUI.

133.    The Product did not conform to Defendants' representations and were not of merchantable quality and were not safe or fit for their intended use because the Product was, and is, unreasonably dangerous and unfit for the ordinary and expected purposes for which it is used in that it caused injury to Plaintiff and others far beyond any acceptable or warned of risk or complication.

134.    As a direct and proximate result of Defendants' breach of the aforementioned express and implied warranties, Plaintiff has suffered serious and permanent physical and mental injuries and pain and suffering; has undergone medical treatment and likely will undergo further medical treatment and procedures; and has suffered financial and economic loss, including, but not limited to, medical expenses, lost income, out of pocket expenses, and other damages.

## COUNT VI: GROSS NEGLIGENCE

135.    All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

136.    In committing the acts and/or omissions set forth herein that directly and proximately caused Plaintiff's injuries, as set forth herein, Defendants breached their duty to

COMPLAINT AND JURY DEMAND

Plaintiff and demonstrated a conscious, reckless, willful, and wanton indifference to and disregard of the consequences of its actions and/or omissions.

137.    Defendants have known and continue to know that some of the predicate products for their pelvic mesh products had high failure and complication rates, resulting in the recall of some of these predicate devices; that there were and are differences between Defendants' pelvic mesh products and some or all of the predicate products, rendering them unsuitable for designation as predicate products; that significant differences exist and existed between the pelvic mesh products and their predecessor and predicate products, such that the disclosures to the FDA were and are incomplete and misleading; and that the pelvic mesh products were and are causing numerous patients severe injuries and complications. The Defendants suppressed this information and failed to accurately and completely disseminate or share this and other critical information with the FDA, healthcare providers, or the patients, including Plaintiff.

138.    As a result, the Defendants actively and intentionally misled and continue to mislead the public, including the medical community, health care providers, and patients, into believing that the pelvic mesh products and the procedures for their implantation were and are safe and effective. This led to the prescription for and implantation of the Product into Plaintiff.

139.    The injuries, conditions, and complications suffered by women who have been implanted with Defendants' pelvic mesh products include, without limitation: mesh erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia, blood loss, neuropathic and other acute and chronic nerve damage and pain, pudendal nerve damage, pelvic floor damage, chronic pelvic pain, urinary and fecal incontinence, the recurrent prolapse of organs, and, in many cases, the women have been forced to undergo intensive medical treatment including, but not limited to, operations to locate and remove mesh, operations to attempt to repair pelvic organs, tissue, and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and operations to remove portions of the female genitalia.

140.    Again, Defendants had sole access to material facts concerning the defective nature of the Product and its propensity to cause serious and dangerous side effects and, hence, cause

COMPLAINT AND JURY DEMAND

dangerous injuries and damage to women who used the Product, including Plaintiff.

141.    Defendants were grossly negligent by showing a complete indifference for the safety and health of Plaintiff and others similarly situated in negligently designing, packaging, labeling, marketing, advertising, promoting, distributing, and selling defective and unreasonably dangerous products and in negligently failing to warn Plaintiff of the significant risks and complications associated with their devices, as set forth above.

142.    In light of the knowledge Defendants had concerning the risks and complications associated with their devices, as set forth above, Defendants continued to show an utter disregard and complete indifference for the safety of Plaintiff by failing to provide adequate warnings concerning the risks and complications associated with their devices, making material misrepresentations and placing profits from sales of its devices over the safety of patients receiving their devices, including Plaintiff.

143.    The wrongs done by Defendants were aggravated by the kind of malice, fraud, and grossly negligent disregard for the rights of others, the public, and Plaintiff for which the law will not allow, and for which Plaintiff seeks punitive and/or exemplary damages, in that Defendants' conduct, including the failure to comply with applicable industry standards, was specifically intended to cause substantial injury to Plaintiff; or when viewed objectively from Defendants' standpoint at the time of the conduct, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, including Plaintiff, and Defendants actually were subjectively aware of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others, including Plaintiff; or included a material representation that was false, with Defendants knowing that it was false or with reckless disregard as to its truth and as a positive assertion, with the intent that the representation is acted on by Plaintiff and her implanting surgeon.

144.    As a direct and proximate result of Defendants' gross negligence, Plaintiff has suffered serious and permanent physical and mental injuries and pain and suffering; has undergone medical treatment and likely will undergo further medical treatment and procedures; and has suffered financial and economic loss, including, but not limited to, medical expenses, lost income,

COMPLAINT AND JURY DEMAND

out of pocket expenses, and other damages.

## VII: PUNITIVE DAMAGES

145.    All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

146.    Defendants sold the Products to the healthcare providers of Plaintiff in the State of California and throughout the United States without doing adequate testing to ensure that the Product was reasonably safe for implantation in the female pelvic area.

147.    Defendants sold the Product to Plaintiff's health care providers and other health care providers in the State of California and throughout the United States in spite of its knowledge that the Product can shrink, disintegrate and/or degrade inside the body and cause the other problems heretofore set forth in this Complaint, thereby causing severe and debilitating injuries suffered by Plaintiff and numerous other women.

148.    Defendants ignored reports from patients and healthcare providers throughout the United States and elsewhere of the Product's failure to perform as intended, which led to the severe and debilitating injuries suffered by Plaintiff and numerous other women. Rather than doing adequate testing to determine the cause of these injuries or to rule out the Product's designs or the processes by which the Product is manufactured as the cause of these injuries, Defendants chose instead to continue to market and sell the Product as safe and effective.

149.    Defendants withheld material information from the FDA, the medical community and the public in general, including Plaintiff, regarding the safety and efficacy of the Product.

150.    Defendants knew and recklessly disregarded the fact that the Product caused debilitating and potentially life altering complications with greater frequency than feasible alternative methods and/or products used to treat POP and SUI.

151.    Defendants misstated and misrepresented data and continues to misrepresent data so as to minimize the perceived risk of injuries caused by the Product.

152.    Notwithstanding the foregoing, Defendants continued to aggressively market the Product to consumers, without disclosing the true risks associated with the Product.

153.    Defendants knew of the Product's defective and unreasonably dangerous nature, but

COMPLAINT AND JURY DEMAND

continued to mislead physicians and patients and to manufacture, market, distribute, and sell the Product so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiff.

154.    Defendants continued to conceal and/or fail to disclose to the public, including Plaintiff, the serious complications associated with the use of the Products to ensure continued and increased sales of the Products.

155.    Defendants' conduct as described herein shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care that raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor against Defendants for actual, compensatory and punitive damages, plus attorneys' fees and expenses, costs, interest, and such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action.

Dated: March 29, 2021                        Respectfully submitted,


By: /s/ Alan Law
Alan Law (SBN 268334)
COOPER & SCULLY, P.C.
505 Sansome Street, Suite 1550
San Francisco, CA 94111
Tel: 415-956-9700; Fax: 415-391-0274
Email: alan.law@cooperscully.com

/s/ Nathaniel K. Scearcy
Nathaniel K. Scearcy (pro hac vice pending)
POTTS LAW FIRM
1901 W.47th Place, Suite 210
Westwood, Kansas 66205
Tel: 816-931-2230; Fax: 816-931-7030
Email: nscearcy@potts-law.com

Attorneys for Plaintiff

COMPLAINT AND JURY DEMAND